IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 22, 2024

**STATE OF TENNESSEE v. LUKE JACKSON**

**Appeal from the Criminal Court for Hamilton County**
**No. 308133   Barry A. Steelman, Judge**

————————————————————

**No. E2023-01617-CCA-R3-CD**

————————————————————

Defendant, Luke Jackson, appeals the denial of his motion to withdraw his guilty plea to voluntary manslaughter, for which he is serving a fifteen-year sentence as a Range III offender. On appeal, Defendant contends that the trial court erred in denying his motion to withdraw his guilty plea because (1) he did not fully understand the details of his plea agreement and (2) he received the ineffective assistance of counsel. He asserts that he was unaware that he would be sentenced outside of his range and that he entered the plea out of fear and lack of medical treatment while incarcerated. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Alan C. Norton (on appeal), and Ryan Wheeler (at hearing on motion to withdraw guilty plea), Chattanooga, Tennessee, for the appellant, Luke Jackson.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Coty G. Wamp, District Attorney General; and P. Andrew Coyle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The facts of this case as set forth by the State at the guilty plea hearing are as follows:

[On] March 10 of 2019, the Hamilton communication center received a 911 call at around 8:36 in the morning. That phone call was actually by [Defendant].

On that phone call, he indicates that Starlin Fike - - Starlin Fike was the partner of [Defendant]. They had been in a pretty long romantic relationship that had run over the course of a number of years. He indicated that [Mr. Fike] was nonresponsive inside of a pool house at 200 Hunt Avenue. That's here in Hamilton County.

He indicated on the phone that he had Parkinson's disease - - Mr. Fike did, in fact, have advanced Parkinson's disease - - and that he was unresponsive.

When EMS and the firemen arrived, they found Mr. Fike in that pool house. It's actually a house on the back of that residence, a very small, kind of residential pool house. He was on his back. He was between a couch and a bed. His arms were up, rigor had set in, and he had clear abrasions. He had bruises on his head, he had scrapes all over his neck, scrapes all over his face. There was blood in various different places throughout the pool house.

This pool house was - - it was not destroyed, but the interior of it, things were thrown about, things were broken. Furniture was askew all throughout the pool house. EMS was under the impression this had occurred for some time prior to their arrival.

On the 911 call, [Defendant] indicates that Mr. Fike had been in that position for roughly an hour and a half. That's what he said in the phone call. He went to the - - Mr. Fike was - - of course, his body was sent to the medical examiner's office.

The medical examiner concluded that he had broken bones in his neck which were consistent with manual strangulation; also that he had various different bruises, which were - - I've already said - - but they were diagnosed as well.

The medical examiner, if he were to testify, he would testify that the length of time that it would take to strangle somebody and cause their death would be north of four minutes or more.

On the scene, [Defendant], of course, on the 911 call mentioned nothing about provocation. He mentioned nothing about self-defense. When EMS arrived on the scene, he said to Samuel Branch, EMS worker, that Mr. Fike kept on coming at him, that he had to restrain him in order to keep him from

- 2 -

coming at him. He also said that he was throwing things at him - - Mr. Fike was throwing things at him.

The only injury to [Defendant] that was seen by law enforcement - - of course, he was taken in for a potential interview, which he did not give; he lawyered up - - was a busted lip. He had what could be concluded as a busted lip in the center of his lower lip. No other injuries were seen, and, of course, he was processed and pictures were taken.

The members of the neighborhood, a number of them, were actually interviewed. One of those individuals was a guy named Luke Salsbury. He indicated that the night before, you know, sometime around 2 or 3 a.m., he woke up. He heard [Defendant] screaming at Dewayne. Dewayne, I believe, was in - - I'm sorry. Mr. Fike goes by Dewayne. Dewayne was inside of a car and [Defendant] had a raised voice, and they were clearly arguing.

Another individual from the neighborhood says that he also woke up. He heard yelling.

Another individual, James Rogers, actually said that he woke up, looked out of the - - his home, which is next door to 200 Hunt Avenue. He saw the argument and he saw [Defendant] raise his hand towards Mr. Fike, towards Dewayne, and say, "I love you but I will kill you." And they testified to that in a preliminary hearing as well.

There is surveillance tape which does show some movement between the parties. It does not show conclusively any of the things that I just mentioned that the neighborhood individuals heard.

Also of note, Judge, Mr. Salsbury indicated in the preliminary hearing and also in a statement that he heard Mr. Fike tell him to leave. He also heard them arguing over something that occurred on a cellphone. Somehow there was a dating app where he believed that Dewayne had been caught speaking to another individual, and that he heard [. . .], [Defendant], screaming or yelling about that.

Judge, everyone that we've spoken to in the neighborhood says this was a normal occurrence, that the couple fought pretty consistently. The majority of those individuals, they would describe [Defendant] as the aggressor. Some of the individuals said that it was - - they would describe it as kind of a mutual verbal combat.

- 3 -

These are individuals that would come and testify that they have seen [Defendant] be violent to Mr. Fike in the past, not so much necessarily hitting or beating him, but just getting in his face and having to be restrained at certain points.

At the plea hearing, Defendant told the trial court that his attorney had reviewed the guilty plea petition with him and explained it to him. Defendant was aware that he was charged with first degree murder which carried a life sentence and if convicted, meant that he would serve fifty-one "calendar years day for day" before being eligible for parole. He was further aware of the lesser-included offenses. Defendant indicated to the trial court that he understood he had a right to proceed to trial and not accept the guilty plea and that the burden of proof was on the State. The trial court advised Defendant that he could not be compelled to testify at trial, and the court would instruct the jury as such. The trial court extensively reviewed with Defendant his rights should he proceed to trial and advised him he could appeal his conviction if found guilty. Defendant indicated to the trial court that he understood all of his rights, that he had discussed the plea offer with his attorney, family members and trusted friends, and that he wished to waive his rights and plead guilty.

However, Defendant also told the trial court that he did not believe he had gotten "all of the evidence" that he needed and that there were a few things that had "been left unresolved." When the trial court asked Defendant about the unresolved matters, Defendant replied: "Just the evidence of my clothing; the DNA of, of - - on the clothes, on the candles that I was assaulted by; the, the cellphones; the phone records. Things of that nature aren't available to me at this time." Defendant believed that evidence would show that he was "acting in [self-]defense for [his] own safety and life." Trial counsel then indicated to the trial court that he and Defendant had discussed the matter, and he would discuss it with Defendant again to "clear some things up." Defendant ultimately informed the trial court that he had been advised that it was in his best interest to plead guilty considering the facts and circumstances of his case and that he wished to plead guilty to voluntary manslaughter with an agreed out-of-range sentence. The trial court then took a fifteen minute recess to allow Defendant to talk further with trial counsel about the plea. Thereafter, Defendant returned to the courtroom and informed the trial court that he still wished to go forward with the plea, and he did not have any further questions. The trial court explained that under the terms of the plea agreement, Defendant would be "pleading guilty in a way that you're going to serve more time than you would if a jury convicted you of voluntary manslaughter." Defendant stated that he agreed and he entered an *Alford* or best interest plea to voluntary manslaughter with an agreed out-of-range sentence of fifteen years as a Range III offender to be served in the Tennessee Department of Correction ("TDOC"). *See North Carolina v. Alford*, 400 U.S. 25 (1970).

After sentencing but before the judgment was final, Defendant filed a pro se motion to withdraw his guilty plea arguing that there were multiple discovery violations, that he

received the ineffective assistance of counsel, and that his petition was signed under duress. Counsel was appointed, and a hearing was held on the motion.[1]

At the hearing on the motion to withdraw, Defendant testified that he initially retained counsel to represent him; however, he eventually exhausted his financial resources, and the trial court appointed trial counsel to represent him. Defendant described his relationship with trial counsel as: "Distant. Very questionable. It was not very clear. It was pretty much hit-or-miss when it came to communication, and not as informative or as helpful as [he] would have expected from an attorney." Defendant testified that he had some concerns about discovery and that there were a "few discrepancies" as to his identity, questions about the autopsy and certain evidence that could be used to exonerate him of "these charges, not appearing, not being listed, as well as just the diligence of doing the investigation properly as I feel that a lot of the evidence that's been brought forth has been manufactured or distorted to strengthen the State's case and perpetuating a lie." Defendant testified that he expressed these concerns to trial counsel on multiple occasions.

As to his concerns about video evidence and witness statements, Defendant testified:

> The affidavit of complaint says that James Rogers heard me say, "I love you, but I'll kill you," to Dewayne and had video evidence corroborating that statement, something about me having my hands around his neck outside. That probably, at the time, was an Airbnb and it had tenants in the house. No one in the house came to the aid of any of us or Dewayne or I or brought any sort of attention.
>
> And there's a fence between Mr. Rogers's house and Dewayne's backyard and it brought into question why his surveillance video, if he had one, was pointed at the backyard, because Dewayne was looking over the fence. I believe Dewayne and Mr. Rogers had some sort of secret relationship going on because I know Mr. Rogers has sold Dewayne drugs in the past.
>
> But I never got to see the video. I never got to see the transcripts of the - - of Mr. Rogers's testimony stating what he said. All I've seen are affidavits of complaint. I haven't gotten any sort of evidence to - - or any sort of opportunity to challenge that.

Defendant testified that he addressed this concern with trial counsel prior to entering the guilty plea. He said that the clothing he was wearing at the time of the offense and a

---

[1] Defendant filed various other pro se motions after counsel was appointed, including a petition for post-conviction relief, which were dismissed by the trial court because the motion to withdraw Defendant's guilty plea was still pending.

scented glass candle that Mr. Fike used to hit him in the face were also missing from discovery. Defendant mentioned a statement from a neighbor, Luke Salsbury, who said he saw Defendant walking away from Mr. Fike and that Mr. Fike was following Defendant who was covered in blood. Defendant claimed that Mr. Salsbury's statement would have shown that he was not "stalking" Mr. Fike, and that Mr. Fike came looking for him and was following him instead.

Defendant testified that he told trial counsel that he felt "targeted" while in custody and had experienced traumatic injuries. He said that trial counsel told him, "We're going to see about getting you transferred to another facility." Defendant testified that at the time of the plea hearing, he had been under "judicial hospitalization" at Moccasin Bend for three months and that the injuries he sustained while incarcerated influenced his decision to plead guilty because he was "afraid [he] was going to die if [he] didn't get away from these people." He explained that "these people" meant:

> [T]he custodians, Hamilton County Sheriff's Office, the medical people who are working at the sheriff's office, the prosecution who hasn't given the exculpatory evidence that I feel that they have, which they have a duty to do, me not getting the help in proving the facts of the case and finding out the truth of the matter.

Defendant claimed that fear was "[p]aramount" in his decision to plead guilty based on his interactions while in custody of the Hamilton County Sheriff's Office.

Defendant testified that trial counsel approached him with the final plea offer for voluntary manslaughter a few days before he entered his plea. At that point, Defendant was "disturbed" that trial counsel was not "on [his] side." He said:

> The way he approached me was more emphatic that he couldn't win the case or wouldn't win the case, and that if I didn't want - - if I wanted to see my mom again and get out and not do 51 years, that I need to take the plea, whereas at first he seemed confident that we could get this resolved.

Defendant testified that trial counsel told him that he would not be in prison for long, could get an education, and "get away from this situation to where I can get better medical help, because DNA was underneath my fingernails." He said trial counsel did not see any way to win the case. Defendant further testified:

> He had mentioned it was 15 years at a percentage rate of 45, which at that time was Greek to me. I don't understand what a sentencing range is, sentencing guidelines. I don't know anything about that. I've never been in trouble. I don't know what that means and what that meant. He didn't do a very good job of explaining what that meant. He said about upping my range

and I didn't know - - I really still - - I'm still fuzzy on that, on what that truly means, but pleading out of range to a 15-year sentence is basically what he convinced me to do and said that my family and support system also recommended it.

Defendant also asserted that he feared not having everything he needed to "move forward to make an adequate defense," and that the conditions he was "under and subject to while in custody" was the "majority of the reason" why he accepted the plea offer.

Defendant testified that he attempted to fire trial counsel because Defendant felt there was enough evidence to exonerate him of the charge; however, trial counsel returned the following day with co-counsel who also recommended that Defendant accept the plea offer. Defendant said he decided to accept the fifteen-year offer because he was "scared to death" of spending the remainder of his life in prison.

Defendant testified that he had reviewed the transcript of the guilty plea hearing, and he did not recall much of what he read in the transcript. "There are things that are absent. There are things that don't seem consistent. It doesn't feel like the hearing that I went to." He also said that he was "a bit stunned and perplexed" and that the transcripts read differently than he remembered responding to the trial court. Defendant recalled having a conversation with trial counsel during the guilty plea hearing. He said that trial counsel was frustrated and informed him that his mother was at the hearing. Defendant testified that trial counsel wanted him to make the "right decisions" so he could go back home with his family sooner and receive better healthcare in the custody of TDOC.

Defendant testified that prior to accepting the plea offer, he spoke with retired Judge Walter Williams who advised him that "manslaughter was the accurate charge" and that he should accept the plea offer as "opposed to premeditated murder." He noted that his mother had informed Judge Williams that Mr. Fike came looking for Defendant, "so there was nothing malicious about me - - there was no malicious intent of me seeking him out, and he felt that the ranges or the charges were wrong and that I should take the manslaughter." They did not discuss sentencing. Defendant asserted that he had already signed the plea agreement when he spoke with Judge Williams, but he planned not to go forward with the plea at the hearing because he signed the agreement "under threat, duress, and coercion." However, "with the consultation from Judge Williams and the concern from [his] mother, [he] went ahead with the plea."

Defendant testified that he was "shocked" at the plea hearing when the trial court informed him that if found guilty of manslaughter at trial, the most he could serve would be six years. He claimed that no one reviewed the "ranges" or "percentages" with him. Defendant further testified that he was still "questionable" when the trial court ordered a recess but with his "trust and admiration for Judge Williams and to save [his] mother the stress, being 80 plus years old, [he] went ahead and went forward with accepting the plea."

- 7 -

On cross-examination, Defendant agreed that his version of events at the time of the murder was very different than those set forth by the State at the guilty plea hearing. He did not recall Mr. Rogers's testimony about the position of his hands at the time of the offense, and he had not seen a video of his hands allegedly "aggressively focused on [Mr. Fike]." Defendant also claimed that he was covered in blood from where Mr. Fike hit him in the face with a candle; however, he agreed the photographs taken by police did not show any abrasions. He agreed that Mr. Fike's blood was under his fingernails but also said that his blood was under Mr. Fike's fingernails. Defendant agreed that he was in the pool house with Mr. Fike for a "pretty good" amount of time and first called his mother who instructed him to call 911.

Defendant testified that the State withheld exculpatory evidence consisting of the video corroborating Mr. Rogers's statement and the shirt, pants, and shoes Defendant was wearing at the time of the murder. Regarding the clothing, Defendant claimed that the State withheld exculpatory evidence by not sending the clothing to the Tennessee Bureau of Investigation ("TBI") for testing. He also claimed that the blood evidence found under his and Mr. Fike's fingernails was fabricated. Defendant agreed that he did not tell any of the investigators that Mr. Fike hit him with a candle and that he only gave that information to his attorneys. He assumed any evidence collected at the scene was sent to the TBI for testing. Defendant testified that Mr. Fike's blood being found at the scene was not "true." Although the autopsy report reflected that Mr. Fike had no drugs in his system, Defendant said he had information from another report that Mr. Fike tested positive for "crystal methamphetamine in his blood."

Defendant testified that he was "aggressively" presented with a plea agreement on December 14, 2021, within a month of his scheduled trial date. He did not understand at that time that a life sentence for premeditated first degree murder would be fifty-one years with the possibility of parole after that time. He thought that his sentence would be fifty-one years without that possibility of parole, and he did not believe that he would survive fifty-one years "under the conditions." Defendant estimated that he discussed the plea offer with trial counsel for thirty to forty-five minutes, and Defendant was upset because he was not getting trial counsel's "full attention to detail when it comes to investigating the truth of the situation." Trial counsel and co-counsel advised him that his case was unwinnable since Mr. Fike had Defendant's DNA under his fingernails. He said that trial counsel had originally said he could negotiate a better plea offer than the one presented on December 14. Defendant disagreed with the autopsy report findings that Mr. Fike died of manual strangulation because he did not choke Mr. Fike. Defendant testified that his mother advised him to accept the plea offer, and he did not feel that he had all of the "evidence necessary for his defense."

Defendant agreed that above his signature on the plea agreement form he wrote "TDC" which stood for "threat, duress, coercion." Underneath his signature he also wrote "All Rights Reserved," which he believed would invalidate the agreement if the State

- 8 -

committed fraud, and the State had "violated" his rights. Although Defendant initially denied talking to anyone about the agreement during a jail phone call, the State introduced a recording of a jail call between Defendant and his cousin. Defendant then admitted that he called his cousin the day after the plea hearing and asserted that he purposely signed the plea agreement form in such a way that he believed he could withdraw it. During the call, Defendant said that his plea would not "hold up in a court of law," that the "country bumpkins" in court did not know it was not binding, and that "if they send me to prison[,] I can sue their ass." Defendant claimed that he signed the form in this manner to "protect" himself from "predatorial prosecution." He reiterated that he thought the transcript of the guilty plea hearing had been altered; he did not recall reviewing the waiver of sentencing range with the trial court. Defendant testified that he had the choice between serving fifteen years and fifty-one years, and he "went with the lesser." He also said that he committed perjury during the guilty plea hearing by admitting to something he did not do but he did not attempt to commit fraud by adding additional language to his signature.

Judge Walter Williams practiced law in Tennessee and Georgia for about forty-five years and "taught school at the university," but was "pretty much retired" at the time of the hearing. He and his family were friends with Defendant's family and had known Defendant "[a]ll his life." He told Defendant and Defendant's mother that he could not represent Defendant, but could give him limited advice. He advised Defendant of his rights and the range of punishment for the charges but he never looked at any "papers." He relied on information that came from Defendant or Defendant's mother. Judge Williams testified that he and Defendant discussed a plea offer but he did not know anything about voluntary manslaughter. He said: "I must have fallen asleep when [the trial court] talked about it, but I don't remember anything about voluntary manslaughter. Nothing." Judge Williams testified that he discussed the matter with trial counsel, co-counsel, Defendant, and Defendant's mother, and he recommended that Defendant accept the plea offer, which Judge Williams thought was to first degree murder. However, he never actually saw the plea agreement and would have never recommended that Defendant plead guilty to voluntary manslaughter with forty-five percent release eligibility. He thought the agreement was for Defendant to plead guilty to first degree murder with thirty percent release eligibility.

On cross-examination, Judge Williams testified that he was present at the guilty plea hearing and that he and Defendant's mother were allowed to speak with Defendant before he entered the guilty plea.

Trial counsel testified that on June 30, 2020, he was appointed to represent Defendant, who had previously been represented by the public defender's office. Discovery, which included the lab report and evidence inventory log, had been provided to the assistant public defender handling Defendant's case and was forwarded to trial counsel. He met "extensively" with Defendant face-to-face or virtually by FaceTime, and "some cell phone." Trial counsel testified that he reviewed the case status and discovery with

Defendant and although previous counsel had provided Defendant with discovery, "we also printed out everything that we had and delivered that to him also, just to be thorough." Trial counsel testified that he reviewed the video of the crime scene with Defendant on trial counsel's computer, and they "definitely" discussed recorded witness statements. Trial counsel noted that he had frequently spoken with Defendant's mother when she called his office, and Judge Williams had also called his office. However, he had to "put some boundaries in line with Judge Williams because I had attorney-client privilege[,] and I made that clear to him that there's certain things that I could not discuss with him."

Trial counsel testified that he met with the State about Defendant's case, and his goal was to "protect my client's rights and to get the best possible outcome for my client that I could." He also spoke with co-counsel in his office about strategy and discovery in Defendant's case. Trial counsel testified that he was prepared for Defendant's trial scheduled for January 4, 2022, and while working on the case, he and the State had a conversation about a potential plea agreement. He noted that Defendant was open to both making and receiving a plea offer from the State.

Trial counsel agreed that the fifteen-year offer for voluntary manslaughter was the State's "bottom line." He testified that he met with Defendant about the offer on December 14 and 15, 2021. He had a "Tennessee sentencing guideline form with the different classifications, with the different ranges. And [he] went over it point-by-point-by-point with him what this offer would mean." He gave the sentencing guideline form or chart to Defendant. Trial counsel testified:

> And so we went through, you know, what he was charged with and the lesser-included, just point-by-point-by-point, and, you know, what would potentially happen. And then we also went into what would happen if he was found guilty. We went over the case some more. And I was very honest with him. I gave him my honest legal opinion that it was - - based on the facts that were available, it was unlikely that he would prevail in this case just based on my opinion.
>
> And so I presented him with, you know, on the one hand, if he was found guilty, what it would be, and on the other hand, what the plea would mean. I always let him know, you know, there's a possibility that you are found not guilty. And I also let him know that this decision is up to you. It wasn't some emotionally charged interaction or anything like that, just matter-of-factly let him know that this is what it was if he wanted to go with trial, then that is his decision. Either way we would be prepared.

Trial counsel did not recall whether Defendant initially accepted the plea offer on December 14, but Defendant raised the issue of "some outstanding evidence, which I . . . had addressed with him previously." Trial counsel noted that Defendant mentioned the

evidence, consisting of bloody clothes and a cell phone, "on a regular basis." Trial counsel followed up on the items, but they were not in evidence, and he was not "sure about the existence of those items." He agreed that Defendant thought that there was "some grand conspiracy by the State"; however, there were no facts to support Defendant's claim.

Trial counsel testified that he received a call from Defendant's mother on December 14, 2021, with concerns about Defendant's case. Trial counsel assured her he would speak with Defendant again, and he and co-counsel went to speak with Defendant the following day. They met for approximately forty-five minutes to an hour. He testified:

> And so on the final day, [co-counsel] and I went out there, and during that visit, went over kind of just sentencing again, just on what everything would mean. We went over the guidelines again with him, the ranges again with him, and the lesser-includeds with him, possibility, you know, that it may be an acquittal, and [co-counsel] - - well - - expressed kind of our thoughts on the likelihood of prevailing on the case, and we - - I didn't believe that, you know, there was much - - that it was likely that we would prevail on that case, just based on my honest opinion[.]

Trial counsel testified they advised Defendant and made it clear that it was his decision whether to plead guilty. He left a copy of the plea agreement, and "by that time, it was something that [Defendant] wanted to do at that point." Trial counsel testified that it was when "confronted with, you know, what we believe were, you know, his options, he did choose the 15-year sentence." He said it was clear that it was a Range III sentence at forty-five percent, and he explained to Defendant that he would be pleading out of range, and he was with Defendant when he signed the range waiver the following day.

Trial counsel testified that he and co-counsel reviewed the plea agreement, along with the range waiver, again with Defendant on the day of the guilty plea hearing. He said that Defendant "may have" had some questions but trial counsel "cleared them all up." Trial counsel was present at the guilty plea hearing when Defendant told the trial court that he had no questions for his attorney and that trial counsel had answered all questions. Trial counsel recalled that the trial court gave Defendant the opportunity to speak with trial counsel again during the hearing, and they met in an "auxiliary room" to speak privately. Trial counsel testified, "that would've been just to go over, you know, specific questions he had, go over everything again with the plea, and that was it." Defendant's mother and Judge Williams also joined them toward the end of the conversation. Trial counsel testified that Defendant did not seem to be "under any coercion or duress" when he entered the guilty plea. Defendant never said that he wanted to go to trial. Trial counsel testified that a "day or so" after the hearing, Defendant saw a news story about his case, and "he did express some embarrassment about, you know, the case." At that point, Defendant mentioned withdrawing his guilty plea.

On cross-examination, trial counsel testified that he did not file any motions in Defendant's case related to discovery and that there were no hearings on discovery issues. He contacted one of the lead detectives to inquire about cell phones and a bloody shirt, and he was advised that the items were not recovered. He did not check to see if the items were in the evidence room at the Chattanooga Police Department. He relayed this information to Defendant who felt that there was a conspiracy against him.

Trial counsel testified that Defendant viewed videos and audio recordings through trial counsel's laptop and asked questions about witness interviews. Trial counsel and a private investigator attempted to speak with witnesses, but the witnesses would not talk to them.

Trial counsel reiterated that the fifteen-year at forty-five percent offer was the State's "bottom line." He said that he may "have floated a counter [offer] just to do so, but it was made apparent that this was the bottom line." Trial counsel understood that at that point, no further conversation would have been "tolerated." He said that he made it clear to Defendant that it was forty-five percent parole eligibility and that Defendant "may have had some questions, but, you know, definitely made an effort to clear it up with him because we would have gone point-by-point-by-point with the lesser-includeds." Trial counsel testified that on both December 14 and 15, 2021, he advised Defendant "this is what happens if you're convicted, this is what happens if we plea, and then just went through everything line-by-line." Trial counsel asserted that he wanted to be " aboveboard and thorough" with Defendant based on his history of "dealing" with Defendant. He said that Defendant signed the plea agreement form on December 15, and he did not ask why Defendant wrote "TDC" on page 5, and trial counsel did not know what it meant. Trial counsel asserted that if he had known that it meant "threat, duress, or coercion," he would have addressed the matter. He also did not ask Defendant why he wrote "All Rights Reserved" below his signature.

Trial counsel agreed that Defendant sustained significant injuries during pretrial confinement, and it was a frequent topic of conversation between him and Defendant. He helped coordinate some of Defendant's medical treatment. Trial counsel did not feel that Defendant's physical treatment while in custody was the "deciding factor" in Defendant's decision to plead guilty. He said that the facts of the case were the deciding factor.

Trial counsel testified that when he and Defendant met during a recess at the guilty plea hearing, he wanted to "clarify everything as far as making sure he understood." He said:

> And what he didn't understand - - what I wanted him to be clear about is that, you know, if we go forward with the trial, you're not - - it's not going to be a trial for manslaughter. It's going to be a trial for, you know, [first degree]

premeditated murder. So I think that that kind of threw him off a bit when manslaughter was mentioned through the course of the plea.

Trial counsel testified that any confusion concerning the difference between pleading guilty to a lesser-offense and the charge at trial was cleared up with Defendant. Trial counsel testified that he brought co-counsel in on the case because he felt it would provide Defendant with some "clarity" if co-counsel also gave his thoughts on the case.

On redirect examination, trial counsel agreed that the evidence inventory report listed two shirts. One had "reddish brown stains and off white stains on the sleeves," and the other was damp with red stains. He said that he would have spoken to law enforcement about the items and agreed that the State did not send them to be tested. Mr. Fike's blood was not identified on the shirts. Trial counsel noted that neither of the two shirts were blood-soaked as described by Defendant, and "nothing in evidence was even close to what he had described." Trial counsel did not know of any video evidence favorable to Defendant's case.

When asked by the trial court what in his opinion made "the offer of an up-in-range plea to a lesser-included attractive[,]" trial counsel replied:

Well, the fact that there was the blood under the fingernails, there were scratches on the deceased's neck, and that there was signs of strangulation; for us, we didn't really feel that we had anything to kind of overcome that.

The other thing was we didn't have any counter-narrative that we could rely on to explain what had happened. So that is really kind of what went into our decision.

Trial counsel also agreed that a neighbor heard Defendant say that he loved Mr. Fike but would kill him and that Mr. Fike had a terminal illness and was wheelchair bound and in "very, very, very poor health." Trial counsel felt that this along with the other facts, "the optics of that would have not been good for us." He said that the only mitigating evidence was that there were no eyewitnesses to the actual crime.

The trial court conducted a thorough review of the evidence presented at the hearing on Defendant's motion to withdraw his guilty plea and entered a written memorandum denying the motion.

## Analysis

On appeal, Defendant argues that the "record clearly shows that [he] did not fully understand the details of his plea agreement." More specifically, he contends that he was unaware that he would be sentenced outside of his sentencing range and that the transcript

of the guilty plea hearing demonstrates that he did not understand the terms of the plea agreement. Defendant also asserts that he entered the plea out of fear due to his lack of medical treatment in jail. Defendant further contends that he received ineffective assistance of counsel concerning his guilty plea because trial counsel advised him to plead guilty before the State had provided all discovery. He claims that the discovery previously provided was "severely lacking" and that trial counsel "failed to convey to [Defendant] the nature of pleading guilty to [v]oluntary [m]anslaughter as a persistent offender, even despite [Defendant's] fairly clean record." The State responds that the trial court acted within its discretion by denying Defendant's motion to withdraw his guilty plea because the plea was knowing and voluntary and that Defendant failed to show that trial counsel rendered deficient performance.

The trial court's disposition of a defendant's motion to withdraw a guilty plea is reviewed under an abuse of discretion standard. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005)). Rule 32(f)(2) of the Tennessee Rules of Criminal Procedure provides: "After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice." A defendant has the burden of establishing that the plea should be withdrawn to prevent manifest injustice. *State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). "In determining whether the accused has carried this burden, the trial court must determine whether the accused and any witnesses presented to establish this standard are credible." *Id.* To establish manifest injustice, a defendant must show more than a change of heart or dissatisfaction with the punishment ultimately imposed. *Id.* Furthermore, manifest injustice is shown, for example, when:

> the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*State v. Crowe*, 168 S.W.3d 731, 742 (Tenn. 2005) (footnotes omitted); *see Phelps*, 329 S.W.3d at 444.

"A defendant does not have a unilateral right to withdraw a plea." *Crowe*, 168 S.W.3d at 740 (citing *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003)). Trial courts in determining whether to grant a motion to withdraw a guilty plea "should always exercise . . . discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial." *Phelps*, 329 S.W.3d at 444 (internal quotation and citation omitted).

- 14 -

Initially, we note that claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief. *See State v. Carruthers*, 35 S.W.3d 516, 550 n.29 (Tenn. 2000). They are not typically raised in a motion to withdraw a guilty plea. This court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant . . . amount of development and factfinding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is a "practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a motion to withdraw his guilty plea and because the matter was fully litigated, we will proceed with our analysis of Defendant's claim. *State v. Abdulkarim*, No. M2020-00502-CCA-R3-CD, 2022 WL 122668, at *4 (Tenn. Crim. App. Jan. 13, 2022), *no perm. app. filed.*

Under Tennessee Code Annotated section 40-30-110(f), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her factual allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal or in this case, a motion to withdraw a guilty plea. *State v. Burns*, 6 S.W.3d 453, 461 n.5 (Tenn. 1999) (citing *State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The trial court's factual findings are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, this court reviews a trial court's findings of fact de novo with a presumption that those findings are correct, unless the record preponderates against the actual findings. *Fields*, 40 S.W.3d at 456-58. This court may not reweigh the evidence or substitute its own inferences for those drawn by the trial court, and questions concerning the credibility of the witnesses, the weight and value to be given their testimony and any factual issues raised by the evidence are all for the trial court's determination. *Id.* at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). This court's review of the trial court's conclusions of law is de novo, with no presumption of correctness. *Id.* at 457-58. We also apply the standard in *Strickland* to determine deficiency when reviewing

"challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. *Id.*; *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001). To satisfy constitutional standards of due process, a guilty plea must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). When evaluating the knowing and voluntary nature of a guilty plea, "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *See Turner*, 919 S.W.2d at 353; *Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). This court may consider the following circumstantial factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 905 (Tenn. 1993). "[A] plea is not 'voluntary' if it results from ignorance, misunderstanding, coercion, inducements, or threats." *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010) (quoting *Mellon*, 118 S.W.3d at 345). A defendant's solemn declaration in open court that his plea is knowing and voluntary creates "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Defendant claims that his guilty plea was not "knowingly, voluntarily, and understandingly" entered because he did not "fully understand the details of his plea agreement" and the out-of-range sentence. He further argues that he accepted the "plea deal out of fear that he would not be able to receive proper medical treatment or protection at the facility he was then being housed at."

Concerning this issue, the trial court acknowledged that Defendant's "history of unusual physical injuries and deterioration in pre-plea detention," which was undisputed by the State, was a serious understandable concern for Defendant. However, the court rejected "Defendant's post-plea testimony that, at the time of the plea, he was fearful for his life and health as a result of the conditions of detention" and gave the reasons for its rejection of the testimony. The trial court further pointed out:

As for the Defendant's telephone call to a cousin some time after the plea, it is true that, during the call, the Defendant did not attribute the plea to conditions of detention or admit fear. It seems that his burden during the call, however, was not to explain the plea but to emphasize his cleverness in reserving his rights to withdraw the plea, contrast to his cleverness with others' lack of cleverness, and express his strong feeling about the legal process, including perhaps a sense of injustice or disappointment that he did not receive more benefit of the doubt. The Court therefore does not make the same inferences from the telephone call that the State perhaps makes but finds no ground for withdrawal of the plea in this respect.

The trial court went on to find:

With respect to misleading promises, there is no evidence of any such promises or the effect of any such promises on the Defendant's plea. The Defendant did not testify about any promises of medical care or imminent release at the plea or post-plea hearing and was fully aware of the length of the sentence and his range waiver, both of which were inconsistent with imminent release. Even if he did hope for an improvement in medical care with a transfer to the Department of Correction, the [c]ourt finds no ground for withdrawal of the plea in this respect, absent fear for his life and health at the time of the plea.

The trial court ultimately concluded that Defendant's guilty plea was valid. The court specifically considered Defendant's literacy and intelligence; Defendant's competence; trial counsel's effectiveness; the court's thoroughness at the plea hearing reviewing the charge, Defendant's sentencing exposure and rights, the plea agreement, and the range waiver, responding to Defendant's concerns, and "exploring the voluntary and intelligent nature of the plea;" Defendant's opportunities to consult with his mother and Judge Williams before and during a break in the plea hearing; Defendant's ability to assert his rights and express concerns before and during the plea hearing; Defendant's awareness of unfavorable evidence and lack of favorable evidence; and Defendant's "appreciation of the advantages and disadvantages of the plea agreement, as evidenced by his ambivalence."

The record supports the trial court's findings. At the guilty plea hearing, although Defendant told the court about his injuries while incarcerated and that he wanted to go home as quickly as possible to get out of custody to heal, he did not assert that he took the plea deal out of fear that he would not be able to receive proper medical treatment or protection at the facility where he was incarcerated. He told the court that his multiple physical problems along with the facts and circumstances of the case and the law were his reasons for accepting the plea. He had also been advised that accepting the plea was in his best interest. At the hearing on Defendant's motion to withdraw, trial counsel testified that

Defendant's treatment while in custody was not the "deciding factor" in his decision to plead guilty, rather the facts of the case were the deciding factor.

As to the terms of the plea agreement, trial counsel explained the plea agreement to Defendant multiple times to make sure that he understood the terms, and trial counsel answered every question that Defendant asked. He explained the sentencing ranges to Defendant and gave him a sentencing guideline form which reflected the ranges. Trial counsel made it clear to Defendant that he was charged with premeditated first degree murder and that the offer was to plead guilty to voluntary manslaughter with an out-of-range sentence of fifteen years at forty-five percent as a Range III offender.

Moreover, at the guilty plea hearing, Defendant told the trial court that trial counsel had reviewed the guilty plea petition with him and explained it to him. He was aware that he was charged with first degree murder which carried a life sentence and if convicted, meant that he would serve fifty-one "calendar years day for day" before being eligible for parole. Defendant was also aware of the lesser-included offenses and understood that he had the right to proceed to trial and that the burden of proof was on the State. The trial court advised Defendant of all his rights if he proceeded to trial and that he could appeal his convictions if found guilty. Defendant indicated to the trial court that he understood his rights, had discussed the plea offer with his attorney, family, and friends, and he wished to waive his rights and plead guilty.

The only concern expressed by Defendant at the guilty plea hearing was that he did not believe he had received all the evidence consisting of clothing, DNA, a candle, cell phones, cell phone records, witness statements, and videos, and there were a few things that had "been left unresolved." The trial court then took a recess to allow Defendant to consult with trial counsel. Thereafter, Defendant returned to the courtroom and informed the trial court that he still wished to go forward with the plea and that he did not have any further questions. Based on this evidence, we conclude that Defendant's guilty plea was knowingly, voluntarily, and understandingly entered and that he fully understood the details of his plea agreement.

As to Defendant's claim that trial counsel rendered deficient performance by advising him to plead guilty before the State provided full discovery and by failing to adequately explain the terms of Defendant's guilty plea, the trial court noted that trial counsel had been provided with discovery which included a video surveillance recording, evidence log, witness statements, DNA evidence, and the autopsy report. The trial court implicitly accredited trial counsel's testimony that he was unsuccessful in finding a bloody shirt and favorable witnesses as described by Defendant, "finding only another shirt with a few small reddish-brown stains and uncooperative witnesses."

The trial court further concluded:

With respect to counsel's explanations, there is no dispute that counsel reviewed the plea agreement with the Defendant on 12.14.2021, on 12.15.2021, and, during a break in the plea hearing on 12.16.2021. According to counsel, whose testimony the Court accredits, the pre-plea reviews of the plea agreement, which includes statements of the charge and the possible sentence therefor[e], the prosecution's burden of proof, the defendant's rights and options, and the defendant's range waiver, were thorough and included his assessments of the strengths and weaknesses of the prosecution and the defense and the plea offer. On 12.15.2021, [co-counsel] was present to add his assessment of the strengths and weaknesses of the prosecution and the defense and the plea offer. In addition, at some point, counsel left a copy of the plea agreement and the range waiver with the Defendant.

The efficacy of counsel's explanations is evident from the Defendant's responses during the plea colloquy, which, even if they reflect some ambivalence about the plea agreement, also reflect the Defendant's understanding of the terms of the plea agreement, including the charge, the prosecution's burden of proof, his sentence exposure, his range waiver, and the alternative to a guilty plea, a not-guilty plea and a trial on 01.04.2022, and his appreciation of both the advantages and disadvantages of the plea agreement. His testimony at the post-plea hearing was that he was willing to plead guilty in part because his mother was fearful of a life sentence.

The trial court also noted that the State's plea offer was "unusually favorable to begin with" and that the State was not willing to negotiate any further. The court noted some of the evidence in Defendant's case and concluded:

Thus, even if the risk of conviction for [first degree] premeditated murder and a life sentence was relatively low, it was not non-existent. Furthermore, absent a counter-narrative with which to oppose the theory of the prosecution, the risk of conviction for [second degree] murder with its minimum sentence of 15 years, *see* Tenn. Code Ann. § 40-35-112(a)(1) (limiting the Range-I sentence for a Class-A felony to not less than 15 years and not more than 25 years), at 85-100%, *see* Tenn. Code Ann. § 40[-]35[-]501(i) (requiring a person convicted of certain offenses, including second-degree murder, to serve 100% of the sentence less sentence credits earned and retained up to 15%), was relatively high. Thus, without a counter-narrative to the theory of the prosecution, counsel's advice to accept the plea offer of voluntary manslaughter in exchange for a sentence of 15 years at 45% was reasonable and not deficient. The [c]ourt finds no ground for withdrawal [of] the plea in this respect.

- 19 -

The record supports the trial court's findings as to Defendant's ineffective assistance of counsel claims. At the hearing on Defendant's motion to withdraw his guilty plea, trial counsel testified that Defendant mentioned missing evidence on a regular basis. Trial counsel followed up on those items, but they were not in evidence, and trial counsel doubted that such evidence existed. Trial counsel and Defendant viewed audio and video recordings together on trial counsel's laptop, and Defendant asked questions about witness interviews. Trial counsel and a private investigator attempted to speak with witnesses, but the witnesses would not speak to them. Although Defendant claimed that there was "some grand conspiracy by the State," he presented no facts to support his claim.

Defendant presented insufficient proof at the hearing on his motion to withdraw his guilty plea to substantiate his claim that trial counsel advised him to plead guilty while there was exculpatory evidence missing in discovery. Even if the evidence existed, Defendant does not allege that such evidence would have affected his decision to plead guilty and that he would have insisted on proceeding to trial. Defendant testified that he decided to accept the plea offer because he feared spending the rest of his life in prison if found guilty of first degree murder at trial. Trial counsel pointed out at the hearing on Defendant's motion to withdraw his guilty plea that Mr. Fike had a terminal illness, was wheelchair bound, and was in very poor health at the time of his death. A neighbor had heard Defendant say that he loved Mr. Fike but would kill him. Trial counsel also testified that there was "blood under the fingernails," scratches on Mr. Fike's neck and signs of strangulation. Trial counsel felt that based on the facts, "the optics of that would not have been good for us." He noted that the only mitigating evidence in Defendant's case was that there were no eyewitnesses to the crime.

As to Defendant's claim that trial counsel failed to "properly explain the details of the sentence that was offered by the State in their plea deal[,]" the trial court specifically accredited trial counsel's testimony that he thoroughly explained the sentence to Defendant. As discussed above, trial counsel explained the plea agreement to Defendant multiple times and answered all of Defendant's questions. Trial counsel made it clear to Defendant that he was charged with premeditated first degree murder and that he was pleading guilty to voluntary manslaughter with an out-of-range sentence of fifteen years at forty-five percent as a Range III offender. The trial court at the guilty plea hearing also made the sentence clear to Defendant, and Defendant told the court that he understood.

We conclude that Defendant's guilty plea was knowingly, voluntarily, and understandingly entered with the effective assistance of counsel. He has not shown that the plea should be withdrawn to prevent manifest injustice. Defendant is not entitled to relief.

**Conclusion**

For the foregoing reasons, the judgment of the trial court is affirmed.

s/ Jill Bartee Ayers
JILL BARTEE AYERS, JUDGE